# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| V.I.M. RECYCLERS, L.P., | ) | |
| | ) | |
| Plaintiff-Counterdefendant, | ) | **Case No. 03 C 343** |
| | ) | |
| v. | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| LUKE MAGNER, | ) | |
| | ) | |
| Defendant-Counterplaintiff, | ) | |
| | ) | |
| INDUSTRECYCLE, L.L.C., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

A trusted young salesman sets up a company to compete with his employer. He competes with his employer both before and after he quits his employment. He lies to his boss about why accounts have been lost. He misrepresents to his boss that he is soliciting business for his employer, when in fact, he is soliciting the business for his own company. It takes a number of months after the employee quits for the employer to learn what happened. The employer sues. There is no issue of liability. The case presents important questions of damages.

Plaintiff V.I.M. Recyclers, L.P. ("VIM" or "Plaintiff") brings this action against Defendants Luke Magner ("Magner") and Industrecycle, L.L.C. ("Industrecycle") (collectively referred to as "Defendants") alleging causes of action for breach of fiduciary duty, fraud, and tortious interference with prospective economic advantage. Magner has filed affirmative defenses and a counterclaim for breach of contract claiming unpaid commissions

and moving expenses, which he claims justify his conduct. The Court conducted a bench trial on June 1 - 3, 2005, and heard closing arguments by counsel on June 6, 2005. The Court has carefully considered the testimony of the five witnesses who testified at trial, the joint exhibits introduced into evidence ("Ex. __"), the written submissions of the parties, and the arguments of counsel.

The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed to be findings of fact, they also shall be considered findings.

## I. FINDINGS OF FACT

### A. NATURE OF THE ACTION.

1. VIM employed Magner as a salesman from approximately July 1, 1995 until August 15, 2001. T. 131, 271[1]. In July, 1999, Magner and his brother, Tim Magner, formed Industrecycle, L.L.C. Beginning in April, 2000, Industrecycle began to do business with one account in competition with VIM. Between late April and August 15, 2001, Magner diverted the business of four of his major accounts from VIM to Industrecycle.

---

[1]"T" refers to cites to the transcript. The Court has cited to certain exhibits and transcript pages, but relies upon the entire record in support of its findings.

2. VIM's Second Amended Complaint asserts three causes of action: 1) breach of fiduciary duty, 2) fraud, and 3) tortious interference with prospective economic advantage. Count I seeks relief against Magner and Counts II and III seek relief against both Defendants.

3. Magner's counterclaim asserts a claim for partial commissions claimed to be due from VIM for January and February, 2001, and a claim seeking reimbursement of Magner's moving expenses arising out of his move from Chicago to Massachusetts in April, 2001.

**B.    THE PARTIES.**

4. VIM is an Illinois limited partnership with its principal place of business in Glen Ellyn, Illinois. At the time Defendants removed this action to federal court on January 16, 2003, all of VIM's partners were citizens of Illinois. VIM was founded in 1982 by Vince McMahon. T. 60. He sold the business to his sons, Jack and Pat in 1996. T. 61. The sons each own 49% and Jack owns 2% of VIM. T. 62. Jack McMahon testified at the trial. His testimony was credible. He is a Partner and Sales Manager, and performs many other duties at VIM. T. 67-9. VIM provides waste recycling services to industrial and commercial entities that, as a by-product of their operations, produce recyclable waste such as paper, cardboard and plastic. VIM generally provides one or more of the following categories of recycling services to its customers: (a) VIM leases the bin and compacting equipment ("baler") to its customers to condense the recyclables into a quantity commonly referred to as a "load"; and (b) VIM operates as an agent in assisting its customers to market the recyclables to a mill for recycling directly or through a broker. VIM picks up the recyclables based on customer requests. T. 84. VIM operates in 25 states with a sales force of between 2-5 salespeople. T. 66. VIM's customers were generally long-term accounts who either used

VIM exclusively for their recyclables at a specific location or possibly split the business with one or more recycling companies, depending upon the volume and type of recyclables involved. T. 81.

5. Defendant Magner is a citizen of Massachusetts. He turned 29 years old on May 30, 2001. T. 663. He married in August, 2000. T. 663. He was employed by VIM as a salesman from July, 1995 through August 15, 2001. From July, 1999 until approximately July, 2002, Magner was a Vice President, Manager, and 50% owner of Industrecycle. His brother, Tim Magner, was the President and owned the other 50%. On or about July, 2002, Magner became the President and 99% owner of Industrecycle. Tim Magner's ownership interest was reduced to 1%. Magner testified at the trial. His testimony was not credible in parts, particularly where it conflicts with the testimony of Jack McMahon. This credibility finding is based on Magner's less than honorable conduct, his filing of false answers to requests to admit earlier in the case, and his demeanor on the witness stand. *See eg.*, T. 600-09, Ex. 265.

6. Industrecycle is a Massachusetts limited liability company with its principal place of business in Massachusetts. At the time of the filing of this lawsuit and its removal to federal court, the two owners and members of Industrecycle were citizens of Massachusetts and Wisconsin. T. 63. Industrecycle is a competitor of VIM. Magner operates the company as a one employee operation. T. 678-79.

## C. MAGNER'S EMPLOYMENT AND TRAINING AT VIM.

7. On July 1, 1995, VIM hired Magner as a salesman shortly after he graduated from

the University of Massachusetts. Magner had no prior experience in the recycling business. T. 95, 355. At the time, his brother, Tim Magner, was employed by VIM as a salesman. Tim Magner was employed by VIM from 1993 until 1997. T.352. After Tim Magner left VIM, he went to work for a heavy rigging company in Milwaukee and then moved to Massachusetts in 1999, where he stayed in the heavy rigging industry. T. 352-54.

8. Jack McMahon trained Magner over a two-year period. T. 70, 86-7, 263-64, 355-57. VIM provided Magner with a base of existing customers while he developed his own book of business. T. 95-7, 667-68. Magner was trained to prepare VIM quotes to customers. T. 88-91, Ex. 180. Magner made excellent progress as a salesman and he developed a close working relationship with Jack McMahon, his supervisor, and the VIM customers. T. 87, 109-10. By 2001, Magner was servicing approximately 75-100 customers, and his income increased each year. Ex. 243, T. 172. Most of Magner's customers were in the Midwest. T. 121. VIM provided him with a great opportunity. T. 363. His compensation at VIM was as follows:

| | | |
|---|---|---|
| 1995 - $8,451 | 1998 - $43,264 | 2001- $35,602 (through 8/15) |
| 1996 - $20,879 | 1999 - $72,660 | |
| 1997 - $27,270 | 2000 - $90,674 | |

T. 143-44, Ex. 131. Magner's VIM income decreased in 2001, due in part to the economy and the diversion of accounts to Industrecycle. T. 121-23.

9. Magner did not have a written employment contract with VIM, nor was he ever provided with an employee handbook. T. 360, 595, 666. Magner was an employee at will and his rates of compensation and expense reimbursement were left to VIM's discretion. T.

103. Salespersons were paid through commissions and hourly for office time. T. 91-2. VIM provided Magner with monthly commission statements. T. 126-7, 669, Ex. 243. These commission statements were prepared by Jack McMahon. T. 69. Salespersons were paid 10% of gross sales on accounts they initiated and 5% on accounts given to them by VIM. T. 97. VIM also paid its salespersons for other services sold to customers and for profits made during good times. T. 98-104. There is no written document that fully explains how a salesperson's commission is calculated. T. 278, Ex. 137. VIM did not change its commission policy retroactively. T. 280.

10. Magner was the "point man" for the VIM customers he managed. T. 175, 358. As the point man, Magner supervised the customer relationship, made periodic sales calls in person and by phone, and was generally the only person at VIM who would stay in touch with the customer. T. 175, 265-66. As the point man, Magner understood that he was entrusted with managing the account for the benefit of VIM. T. 358-60. He understood that he was required to use his best efforts to protect and service the accounts for VIM. T. 579-80. He knew VIM would rely on him to take all steps to keep the business for VIM. T. 580-81.

11. Jack McMahon generally conducted monthly sales meetings with all of his salesman to discuss sales prospects, business issues and other matters related to the functioning of the business. T. 110-11. Jack McMahon did not require his salespeople to sign a contract, non-competition or non-solicitation agreements. T. 268. He trusted them as

friends.  He advised his salespeople that if they ever traded behind his back, they would be fired.  T. 216-17.

12.  The VIM commission structure is complicated; it consists of commissions based on the money derived by VIM from baler rentals, the acquisition and resale of recyclables, and other miscellaneous revenue.  VIM also contributes to a pension plan.  T. 105.  In addition, VIM also pays certain of its salespersons' expenses including phone service, fax machines, and provides a company owned vehicle to its salespersons.  T. 106-07.  Each salesperson is required to set up a minimum of 12 new net balers per year.  T. 92-3, Ex. 137.  Every baler short of 12 results in a penalty of $1,000 at year end.  *Id.*

## D.    FORMATION OF INDUSTRECYCLE, LLC.

13.  Sometime in 1999, Tim Magner purchased nine balers at an auction for $12,600.  Ex. 342, T. 763.  Industrecycle was formed on July 6, 1999.  T. 364, Ex. 326.  Magner was listed as a manager and Vice President of Industrecycle.  Tim Magner was listed as a manager and President.  Ex. 323.  In July, 2002, Magner became President and Tim Magner was removed as an officer.  T. 369-70.

14.  Industrecycle conducted no business until approximately April, 2000.  Industrecycle began doing business with Dutch Maid Bakery ("Dutch Maid") on or about April 5, 2000.  Ex. 42, 362, T. 389-94.  The services performed by Industrecycle for Dutch Maid were in competition with the services performed by VIM to its customers.  T. 390.

15.  From the time of its formation in July, 1999, Magner knew that Industrecycle's

business was similar or identical to that of VIM and that Industrecycle was going to provide the same or similar services as VIM. T. 365-67, 373. Although Tim Magner principally serviced the Dutch Maid account, he kept Magner advised of the business being performed with Dutch Maid. T. 394.

16. In July, 1999, Magner executed certain banking agreements with Eastern Bank in Massachusetts in his capacity as Industrecycle's Vice President. Ex. 303. Industrecycle maintained a Register Report listing its financial transactions. Ex. 362.

17. From August, 1999 to February 2001, Magner deposited approximately $4,350 of his own personal funds in Industrecycle's business account. Ex. 362, T. 385. Magner received $2,500 from Industrecycle on May 4, 2001, and approximately $1,708 on August 2, 2001. Ex. 362, T. 388-89.

18. At no time did Magner ever advise VIM of his involvement with Industrecycle. T. 372-75. At the time of trial, Industrecycle had approximately 40 customers, 15 of whom were former VIM customers. T. 762. Industrecycle did approximately $300,000 of business in 2004. T. 621.

**E.      CHANGE IN COMMISSION STRUCTURE.**

19. In late 2000 or the beginning of 2001, Jack McMahon advised Magner and the other salesmen that he was making a change in their commission structure from $70 per load of cardboard that came through the Aurora plant to $3.08 per ton. T. 248-50, 342-43. This change was reflected in Magner's commission statements for January and February, 2001, which he received in late April, 2001. Ex. 237 & 238, T. 250-52. VIM provided Magner

with a detailed breakdown of the commission computations. At no time prior to the filing of his counterclaim on April 21, 2003, did Magner ever dispute the commissions for January and February, 2001. T. 253, 343, 599. The January and February, 2001 commissions were properly computed and paid. Magner's claim that he was underpaid in the amount of $1,411.20 is not supported by the record.

**F.    CLAIM FOR MOVING EXPENSES.**

20. Magner moved from Chicago to Massachusetts on April 2, 2001 at his request. 129-30, 593. He and VIM agreed that Magner would keep all of his Chicago customers and fly back every two months while he built up his business on the east coast. T. 132. Magner was to build a central hub on the east coast and possibly open a VIM facility. T. 132-34. He incurred $2,748.92 in moving expenses. Ex. 376. VIM never promised or represented to Magner that it would pay his moving bill. T. 254. At no time prior to the filing of the counterclaim in this case did he ever request VIM to reimburse his moving expenses. T. 254, 592-93. VIM had neither a policy nor an agreement with Magner to reimburse him for moving expenses. T. 327-28. Magner's claim for reimbursement of moving expenses is not supported by the record.

**G.    MAGNER DECIDES TO AGGRESSIVELY COMPETE WITH VIM.**

21. VIM's business began to suffer in late 2000 and early 2001 due to a downturn in the economy. T. 113-17. VIM was having trouble disposing of the recyclables. T. 725. By April, 2001, Magner was aware that Jack McMahon claimed that Magner had been overpaid by $3,000 in commissions, that he was not meeting his baler quota (12 in a 12-month period or $1,000 per baler is deducted), and that the commission and expense structure had been

slightly changed. T. 728-33. Magner was concerned that he would not receive a paycheck due to the prospective back-charges. T. 733.

22. By April 2001, Magner decided to aggressively compete with VIM through Industrecycle. Magner was concerned about his cash flow. He therefore decided to build Industrecycle while continuing to receive paychecks from VIM. T. 748. Because most of his VIM customers were repeat customers, and because Jack McMahon was helping manage these accounts after Magner's move, Magner was able to continue his income from VIM while working to build Industrecycle. T. 137-38.

## H.    SECRET DIVERSION OF VIM ACCOUNTS.

23. Beginning in April 2001, Magner began to transact business on behalf of Industrecycle with four of his major VIM customers: Olmarc Packaging Company ("Olmarc"), U. S. Gypsum, Sealed Air Corporation ("Sealed Air"), and Harris Lamps. T. 547. These were substantial accounts. T. 340. During this period, Magner represented to Jack McMahon that he was continuing to solicit business for VIM. T. 136-37.

### 1.    Diversion of the Olmarc Account.

24. Olmarc is a contract packaging company for large food service companies such as General Mills. T. 162, 654. Olmarc became a recycling customer of VIM's sometime in 1998. T. 163. Magner had no dealings with Olmarc prior to becoming employed by VIM. T. 403. Magner initially solicited the Olmarc account on behalf of VIM. T. 640-41, 671.

25. Magner was VIM's point man for the Olmarc account at its Northlake, Illinois location. T. 403. Magner regularly dealt with Olmarc's representative, Mark Melchiorre ("Melchiorre"), materials manager, at that location. VIM's services to Olmarc dealt

primarily with recycling gaylord boxes, corrugated cardboard, chip board, and moisture sealed bags.  T. 163-68.  Melchiorre testified at the trial.  T. 628-54.

26.  VIM provided ongoing and uninterrupted recycling services to Olmarc on a weekly basis from sometime in 1998 until June, 2001, when Magner and Industrecycle wrongfully diverted the account, and Olmarc terminated its business relations with VIM and began doing business with Industrecycle.  Ex. 5, T. 171-74, 404.  At the time, Olmarc was one of Magner's top ten most lucrative accounts at VIM.  T. 172.

27.  While employed by VIM, Magner contacted Melchiorre  in June, 2001, and informed him that he had left VIM and formed his own recycling company called Industrecycle.  T. 548-49.  Magner did not tell Melchiorre that he was still employed by VIM.  T. 549, 631.  Melchiorre would not have given Industrecycle Olmarc's business if Magner had told him the truth because it would have been unethical to do so.  T. 632.  At the time, Magner was still VIM's point man for the Olmarc account and he knew his conduct was wrong.  T. 550.

28.  Olmarc was not looking to change recycling companies when Magner approached Melchiorre in June, 2001 on behalf of Industrecycle.  T. 552.  Olmarc had not given Magner any indication that it was dissatisfied with VIM when Magner first solicited the account for Industrecycle.  T. 552.  Jack McMahon was not aware of any problems at Olmarc with VIM's services at that time.  T. 177.  Up until the time Industrecycle started pulling Olmarc's recyclables, Melchiorre was satisfied with VIM's services.  T. 632-33, 642.  There was no written contract between Olmarc and VIM.  T. 638.  Magner offered Melchiorre a higher price for the recyclables through Industrecycle.  T. 549, 678.

29.  Industrecycle began picking up loads of recyclables from Olmarc's Northlake, Illinois location on July 6, 2001.  Ex. 4, T. 179-81.  Magner was still employed by VIM on each of the above dates.  Melchiorre did not know that Magner was still employed by VIM when these loads were pulled from Olmarc in July, 2001.  Industrecycle has provided recycling services to Olmarc from July, 2001 to the present.  Ex. 4.

30.  On or about June 29, 2001, Magner misrepresented to Jack McMahon that the Olmarc account was lost to a competitor, when in fact Magner signed up the account for his own rival company, Industrecycle.  T. 175, 553.  Magner knew this statement to Jack McMahon was false.  T. 554.  At that time, Jack McMahon questioned Magner as to what could be done to regain the Olmarc account for VIM.  Magner told McMahon that the account was "lost" and there was nothing VIM could do to regain the business.  T. 176-77.  Jack McMahon had no idea that Magner was the Vice President of the competitor that took the Olmarc account from VIM.  T. 184.  After Magner left VIM, VIM contacted Olmarc on several occasions but was unable to reclaim Olmarc's business.  T. 303-06.

31.  Industrecycle paid Olmarc a total of approximately $86,149.33 in recyclable rebates for the months of August, 2001 through May, 2003.

32.  Industrecycle has provided monthly recycling services to Olmarc at its Northlake, Illinois location from July, 2001 to the present.  On average, Defendant Industrecycle's monthly revenue from the Olmarc account since July, 2001 is approximately $800.00 to $1,200.00.

33.  Olmarc was using VIM's baler to compact the recyclables that Industrecycle picked up in July, 2001.  In August, 2001, VIM's baler was replaced with  Industrecycle's

baler. T. 552. Magner was still employed by VIM at this time. Industrecycle used the same broker used by VIM, Columbia Paper, LLC ("Columbia"), a recycling broker located in Chicago, Illinois, to sell Olmarc's recyclables. T. 182-84.

34. VIM relied upon Magner as its point man to attempt to regain VIM's business with Olmarc and other accounts unknowingly lost to Industrecycle prior to Magner's August 15, 2001 resignation.

**2.      Industrecycle Diverts U.S. Gypsum Account.**

35. U.S. Gypsum in Fort Dodge, Iowa is another VIM account Magner and Industrecycle diverted from VIM while Defendant Magner was employed by VIM. The contact person at U.S. Gypsum was Curly Brand. T. 225.


36. In or about August, 1998, VIM began doing business with U.S. Gypsum to provide a leased baler and weekly recycling services primarily relating to U.S. Gypsum's cardboard commodities, multi-wall bags, bales of cores and stretch wrap. T. 225-26. Magner was the salesman from VIM who initially engaged U.S. Gypsum as a VIM customer and was the point man responsible for managing the account.

37. VIM contracted with Columbia to purchase the loads of U.S. Gypsum recyclables from VIM. VIM's contractual relations continued uninterrupted with U.S. Gypsum from 1998 until about May, 2001 when Magner first proposed to Curley Brand that U.S. Gypsum switch to Industrecycle. U.S. Gypsum had not expressed a desire to switch companies. T. 573. Magner was still employed by VIM at this time. Magner knew that his solicitation of Curly Brand on behalf of Industrecycle was wrong. T. 573.

38. Magner succeeded in convincing U.S. Gypsum to terminate its business relationship with VIM, and in May, 2001, Industrecycle began pulling loads of recyclables from U.S. Gypsum. Industrecycle pulled it's first load from U.S. Gypsum on May 2, 2001. T. 67, p. 837. T. 573-74. Industrecycle pulled the same types of products from U.S. Gypsum as had been pulled by VIM.

39. Industrecycle used the same trucking services and recycling brokers who were used by VIM when Industrecycle began diverting U.S. Gypsum loads from VIM in May, 2001. When confronted by VIM, Magner continually denied that he was trading behind VIM's back. Magner told Jack McMahon that the U.S. Gypsum business was lost to a competitor. T. 228-29.

40. Industrecycle has continued to provide monthly recycling services to U.S. Gypsum from May, 2001 to the present. After the U.S. Gypsum account was lost to Industrecycle, VIM repeatedly and unsuccessfully sent another salesman, Eric Williams, to U.S. Gypsum in an attempt to recapture the account. T. 232, 311-12. U.S. Gypsum continued to lease the baler from VIM after VIM lost the recycling business. T. 227, 309.

**3.      Diversion of the Sealed Air Account.**

41. Sealed Air Corporation ("Sealed Air") is another VIM account that Magner diverted from VIM to Industrecycle while Magner was still employed by VIM.

42. In or about July, 1998, VIM initially contracted with Sealed Air to provide recycling services relative to recyclables made up primarily of densified plastic and plastic bubble wrap commodities at Sealed Air's location in Hodgkins, Illinois. Sealed Air is in the business of manufacturing and supplying protective packaging to various industries. T. 714.

43. Magner was the salesman from VIM who initially engaged Sealed Air as a VIM customer and was responsible for continuing to manage the account for VIM. T. 556, 679.

44. Starting in or around late 1998, VIM arranged to pick-up Sealed Air's densified plastic commodity from its Hodgkins, Illinois location and sell it to Xsresens, Inc., a recycling broker; and to sell Sealed Air's plastic bubble wrap commodity to Harris Lamps in Chicago, Illinois. T. 184-86. Vince McMahon initiated the idea to sell the bubble wrap commodity to Harris Lamps for its use in packaging lamp products. T. 172-73. VIM would then issue rebates to Sealed Air based upon the above sales of its recyclables. Magner was VIM's point man for these transactions. Magner dealt primarily with James Kasprowicz ("Kasprowicz") at Sealed Air. T. 187, 679. Kasprowicz testified at the trial. T. 689-719. Kasprowicz was employed at Sealed Air from 1980 through November, 2001. T. 690. VIM was Sealed Air's exclusive recycler for the products in question at its Hodgkins' location. T. 187. Sealed Air used other recyclers for other products at the time they used VIM to pull the polyethelene foam, the resin, and the shredded paper envelopes with bubble wrap. T. 700-01.

45. VIM's contractual relations continued uninterrupted with Sealed Air, Xsresens and Harris Lamps on a weekly and monthly basis for approximately 2-3 years. Ex. 8-10. VIM did a good job in providing recycling services to Sealed Air's Hodgkins, Illinois location T. 695. Sealed Air was a very significant account because it was tied in with the Harris Lamps account, because the Sealed Air bubble wrap was used as packaging material for Harris Lamps. T. 172-73. There were other recyclers dealing with Sealed Air for other types of scrap. T. 683-84.

46. In or around mid-April, 2001, Magner, on behalf of VIM and Sealed Air's representative, Kasprowicz, traveled to three other Sealed Air locations on the east coast (Holyoke, Massachusetts; Scotia, New York; and Saddle Brook, New Jersey) to discuss expanding VIM's recycling services to those locations. T. 213-15, 561, 741-42. At the time, Kasprowicz was Sealed Air's recycling coordinator. T. 692. According to Kasprowicz, the purpose of the trip was to create a business opportunity for VIM. T. 695. VIM paid for Magner's travel expenses and costs. T. 215. VIM never received any business from those Sealed Air locations. T. 215.

47. Unknown to VIM, Magner ultimately signed up Sealed Air's recycling business in Holyoke, Massachusetts and Saddle Brook, New Jersey for Industrecycle. Exs. 31 & 38. Industrecycle began doing business at the Sealed Air Holyoke location as early as May 3, 2001. Ex. 28-29, T. 559-60. Magner first met the Sealed Air Holyoke representatives during his business meeting paid for by VIM. T. 561. Magner began doing business with the Sealed Air Saddle Brook location in July, 2002. Ex. 38.

48. VIM continued to provide ongoing recycling services to Sealed Air's Hodgkins, Illinois location on a weekly and monthly basis without interruption until about May, 2001 when Magner diverted VIM's Sealed Air's Hodgkins, Illinois account to Industrecycle. Magner was employed by VIM at that time. Magner did not disclose this fact to Kaprowicz. T. 697-98. Had he known, he would not have given the business to Industrecycle. T. 715-18. In or around May, 2001, Magner informed Kasprowicz that he and his brother were going into their own recycling business and offered to provide services to Sealed Air. VIM was still providing recycling services to Sealed Air's Hodgkins, Illinois location when

Magner approached Kasprowicz on behalf of Industrecycle. At the time, there were no problems with VIM's service to Sealed Air. T. 697. Magner knew that his solicitation of Kasprowicz on behalf of Industrecycle was wrong. T. 563.

49. Industrecycle began pulling recyclables from Sealed Air's Hodgkins, Illinois location as early as May 3, 2001. Ex. 11, T. 564. Magner was still employed by VIM at that time. Industrecycle also used XSResens as a recycling broker. Ex. 43. Industrecycle continued to do business at the Sealed Air Hodgkins location continuously through the end of 2004. T. 564. VIM did no business with Sealed Air during this time. T. 207.

50. In June, 2001, VIM received an invoice from Sealed Air requesting payment for a May load of densified bubble wrap. Jack McMahon contacted Magner to follow up and Magner told him that Sealed Air had made a mistake that someone had outbid VIM for the load. T. 190-93, 290-95. In fact, the load was purchased by Industrecycle. Ex. 11. Jack McMahon totally relied upon Magner to preserve the Sealed Air account. T. 196.

51. In or around July, 2001, Jack McMahon specifically confronted Magner as to whether he was trading behind VIM's back. T. 294. Magner did not admit to doing so. Magner misrepresented to Jack McMahon that VIM lost the Sealed Air account to a competitor.

52. After Industrecycle diverted the Sealed Air account from VIM, Pat McMahon attempted on a number of occasions to call Kasprowicz at Sealed Air in an unsuccessful attempt to regain the account. T. 301.

### 4. Diversion of Harris Lamps Account.

53. Harris Lamps is another VIM account that Magner diverted from VIM to

Industrecycle while Magner was employed at VIM. VIM began selling to Harris Lamps in the late 1990's and continuously delivered bubble wrap to them through the spring of 2001. T. 221. In addition, VIM pulled cardboard, metal and sawdust from Harris Lamps for recycling. T. 222. Magner was assigned to handle the account for VIM. T. 222. Harris Lamps ceased doing business with VIM in April or May, 2001. It began doing business with Industrecycle on May 23, 2001, through Magner. Ex. 289, T. 223, 570. Harris Lamps began purchasing Sealed Air's bubble wrap from Industrecycle in May, 2001. T. 570. Harris Lamps also switched its recyclables pickup to Industrecycle sometime after Magner left VIM's employment. Harris Lamps continued to do business with Industrecycle until Harris Lamps went out of business in 2003. T. 687.

54. Although he was employed by VIM, he made these sales on behalf of Industrecycle. T. 570, Ex. 290-95. Magner knew this conduct was improper. T. 571. VIM had been selling Sealed Air bubble wrap to Harris for a significant period of time. As a result of Magner's diversions, VIM's business relations with Harris Lamps was terminated.

## I.    MAGNER LEAVES VIM.

55. Sometime in mid - late July, 2001, Magner told Jack McMahon that he planned to leave VIM in order to pursue work in pharmaceutical sales or the tree service business. T. 138-40. Magner left VIM on or about August 15, 2001. Ex. 130. VIM continued to pay Magner through September, 2001. T. 141-43, Ex. 127-29, 241-46. At the time he left VIM, he was short four balers on a pro rata basis. T. 148, Ex. 383. He was not charged back the $4,000 by VIM because Jack McMahon viewed him as a friend. T. 155-56, 611-12. Jack McMahon did not know at the time that Magner was diverting VIM accounts to

Industrecycle.

## J. INDUSTRECYCLE'S DIVERSION OF OTHER VIM CUSTOMERS AFTER DEFENDANT MAGNER'S TERMINATION OF EMPLOYMENT WITH VIM.

56. Subsequent to Magner's termination of employment with VIM in or around September, 2001, Magner and Industrecycle diverted several additional customers away from VIM including VJI Packaging, East Balt Commissary, Best Kosher, and Newly Wed Foods. T. 245-48, Ex. 243. Magner was the VIM salesperson on these accounts. T.344-45. Magner became familiar with all of the above customers by virtue of his employment with VIM. Subsequent to his employment with VIM, Magner used the information and knowledge he had gained through VIM about the above customers in order to divert them to his rival company, Industrecycle. By the time of trial, Industrecycle was doing business with approximately 15 former VIM accounts. T. 762.

57. Jack McMahon unsuccessfully contacted a number of the above former VIM customers after they were diverted by the Defendants in an attempt to resecure their relationship with VIM.

## K. VIM DELEGATED THE RESPONSIBILITY OF RECAPTURING THE LOST ACCOUNTS TO ITS POINTMAN, MAGNER, NOT KNOWING THAT IT WAS MAGNER WHO ACTUALLY DIVERTED THE ACCOUNTS.

58. VIM took reasonable steps to attempt to regain the loyalty of its lost customers. To that end, VIM directed Magner, as VIM's point man, to attempt to recapture the various lost accounts including Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps. At the time VIM delegated this responsibility to Magner, VIM was unaware that Magner diverted the accounts to his own rival company.

59. While employed by VIM, Magner was charged by VIM with the obligation as

point man to try and recapture the Olmarc, Sealed Air, U.S. Gypsum and Harris Lamps accounts. Magner, of course, did not make any efforts to convince the above customers to leave his rival company, Industrecycle, and return to VIM. Moreover, Magner's fraudulent concealment from VIM of his wrongful diversions of VIM's accounts caused VIM to rely upon Magner to regain the customers' loyalty. Magner's concealment delayed VIM's knowledge of Magner's misconduct, thereby hampering VIM's efforts to regain the customers' business.

**L.    DEFENDANT MAGNER FRAUDULENTLY CONCEALED THE EXISTENCE OF INDUSTRECYCLE (OR HIS DIVERSION OF VIM's ACCOUNTS) FROM PLAINTIFF VIM.**

60.    At no time during Magner's employment with VIM did he disclose the existence of Industrecycle to VIM. At no time prior to VIM's instigation of the instant lawsuit did Magner ever divulge to VIM that he and Industrecycle diverted VIM accounts during his employment with VIM. In fact, as late as April 7, 2003, Defendants served false responses to Plaintiff's Request to Admit Facts, denying these solicitations of VIM's customers. Ex. 265, T. 602-09.

61.    During the time that Magner was employed at VIM, the company had a policy prohibiting VIM salespeople from transacting recycling business behind VIM's back. T. 216-17. Magner was specifically informed while employed by VIM that if VIM salespeople were caught trading behind VIM's back, they would be fired. Magner's conduct in diverting the Olmarc, U.S. Gypsum, and Sealed Air accounts from VIM to his own rival company while employed by VIM was a violation of the above described policy.

**M.    FRAUDULENT CUSTOMER QUOTES.**

62. Magner remained employed by VIM after his move to Massachusetts in the spring of 2001. After the move, Magner continued to inform Jack McMahon from VIM that he was developing accounts for VIM.

63. After his move to Massachusetts, Magner would furnish VIM with copies of various customer proposals that he had purportedly delivered to potential customers.

64. In early June, 2001 Magner sent Jack McMahon a copy of a VIM recycling proposal which he purportedly delivered to Dutch Maid Bakeries out east. Ex. 113, T. 234-35, 347-48. Magner wanted McMahon to think he was busy trying to secure accounts for VIM. T.582-85. At the time Magner sent the Dutch Maid Bakery quote to VIM, his rival company, Industrecycle, was already servicing Dutch Maid Bakery. Ex. 42, p. 513, 524. Magner was attempting to misrepresent to Jack McMahon that he was trying to secure business for VIM. T. 582-85. He did not send the VIM quote to Dutch Maid Bakery since Industrecycle had been servicing Dutch Maid since at least April 5, 2000. Ex. 42, p. 524.

65. While employed with VIM and living in Massachusetts, Magner also sent Jack McMahon a copy of a VIM proposal which he purportedly delivered to one of Sealed Air's locations on the east coast. Ex. 113, pp. 1467-68. Magner did not inform VIM at that time that his rival company, Industrecycle, had already diverted VIM's Sealed Air account relative to Sealed Air Corporation's Hodgkins, Illinois location. Magner knew it was improper to divert VIM's Sealed Air (Hodgkins') account and then send copies of bogus VIM proposals to VIM for other Sealed Air locations. T. 590-91.

66. After moving to Massachusetts, Magner also sent VIM a number of other phony VIM proposals to Jack McMahon while working for his rival company, Industrecycle, including Necco, Quizani Bakery, Bertolino Beef, MJ Malloy, and Floral Dist. Ex. 114-117. These quotes were prepared long after Magner knew that he could not gain their business to make it appear that he was busy working for VIM. T. 794-97.

## N. VIM LEARNS OF MAGNER'S COMPETITION.

67. Sometime between the end of 2001 through the summer of 2002, VIM gradually learned that Magner was competing with it. T. 161. VIM lost the Best Kosher account at the end of 2001, but could not find out to whom. T. 161. In the summer of 2002, Jack McMahon learned from Strand Tech that Magner was in the recycling business. T. 161. VIM's former customers did not disclose that they had switched their accounts to Industrecycle. T. 289-91.

## O. EXPERT TESTIMONY - JOSEPH DUDLEY.

68. Joseph Dudley ("Dudley"), a CPA, testified as an expert witness on the issue of damages. T. 416-536, Ex. 263. He reviewed numerous documents in preparation of his opinions. Ex. 263, pp. 3370-72, T. 433. He prepared a report. Ex. 263. The Court finds Dudley to be credible and his testimony to be helpful. Dudley summarized the lost profits damages from the four major accounts as follows:

|  | **(Two years)** |
| --- | --- |
| **Pre 8/15/01** | **Post 8/15/01** |

| | | |
|---|---|---|
| Olmarc | $1,733.02 | $42,683.68 |
| Xresen (Sealed Air) | 3,117.43 | 14,185.79 |
| Harris Lamps | 881.71 | 5,940.48 |
| U.S. Gypsum | 422.73 | 5,195.34 |
| Misc. Checks | 3,546.90 | 12,499.89 |
| | **$9,701.79** | **$80,505.18** |

Ex. 263, p. 3327. Dudley determined that VIM's gross profit margin was 20.8% and that applying that margin to the information provided from Industrecycle's records resulted in the above lost profits to VIM over a two-year period and an additional $40,000 if applied to a three-year period. The Court finds Dudley's analysis to be reasonable and appropriate. The Court finds his gross profit margin calculation to be reasonable. Industrecycle did significant business with other VIM customers after Magner left VIM. Ex. 263, pp. 3352-53.

69. In addition, Dudley computed damages for wages, fringe benefits and other expenses from the date of Industrecycle's incorporation in July, 1999, to the date of Magner's resignation on August 15, 2001 at VIM of $208,895.25. Ex. 263, p. 3328. These numbers were taken from VIM's accountant. T. 462. Dudley identified a third category of damages as the $253,807.54 in attorney's fees and costs VIM incurred in this litigation through September 27, 2004. Ex. 263. The Court will discuss the issue of damages in detail in its conclusions of law.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION AND CHOICE OF LAW

70. This Court has diversity jurisdiction to decide this case. 28 U.S.C. §1332(a)(1). Section 1332(a)(1) provides federal courts with jurisdiction over all civil cases where the matter in controversy is in excess of $75,000.00 and is between citizens of different states.

71.  Plaintiff VIM is an Illinois limited partnership with its principal place of business in Glen Ellyn, Illinois.  All of the partners of VIM are citizens of Illinois.  Defendant Magner is a citizen of Massachusetts.  Defendant Industrecycle is a Massachusetts limited liability company with its principal place of business in Massachusetts.  The two members of Industrecycle are citizens of Massachusetts and Wisconsin.

72.  The amount in controversy is "whatever is required to satisfy the plaintiff's demand, in full, on the date the suit begins."  *Hart v. Schering-Plough Corp.,* 253 F.3d 272, 273 (7th Cir. 2001).  Pursuant to the complaint, VIM claims that it is entitled to compensatory damages, punitive damages, and pre-judgment interest in excess of $601,000.  Accordingly, the Court has subject matter jurisdiction.

73.  As per the parties agreement, Illinois law applies.

74.  The Court will address the legal issues in the following order: 1) VIM's claim that Magner breached his fiduciary duty; 2) VIM's claim that Magner and Industrecycle committed fraud; 3) VIM's claim that Magner and Industrecycle tortiously interfered with VIM's prospective business advantage; 4) Magner's counterclaim for commissions and moving expenses; and 5) damages.

## B.    MAGNER'S BREACH OF FIDUCIARY DUTY

75.  VIM first claims that Magner breached his fiduciary duty by creating and operating a rival company, Industrecycle, and then diverting VIM's business while still employed at VIM.  In order to succeed on a claim for breach of fiduciary duty, a plaintiff must establish the existence of a fiduciary duty, a breach of that duty, and damages proximately resulting from the breach.  *Schwendener v. Jupiter Electric Co.*, 2005 Ill.App.

LEXIS 425, *3 (Ill. App. Ct. May 11, 2005), citing *Neade v. Portes*, 739 N.E.2d 496, 502-503 (Ill. 2000).

76.  It is well settled under Illinois law that an employee owes a duty of fidelity and loyalty to his employer.  *See ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237 (Ill. App. Ct. 1978).  Accordingly, a fiduciary cannot act inconsistently with his agency or trust by soliciting his employer's customers for himself. *Id.*

78.  Illinois courts have recognized that an employee may take part in some preliminary competitive activities without breaching his fiduciary duty.  Generally, employees may plan, form, and outfit a competing corporation while still working for the employer, but they may not commence competition.  *Dowell v. Bitner*, 652 N.E.2d 1372, 1379 (Ill. App. Ct. 1995).  Thus, an employee may form a rival corporation and outfit it for business while still employed by his future competitor.  *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 993 (Ill. App. Ct. 1993).  However, that employee crosses the line and breaches his fiduciary duty when he goes beyond such preliminary competitive activities and commences business as a rival concern.  *Id.*; *see also Everen Sec. Inc. v. A.G. Edwards & Sons, Inc.* 719 N.E.2d 312, 318 (Ill. App. Ct. 1999) (holding that former general employees may compete with their former employers absent a contractual restrictive covenant, provided there was no demonstrable business activity before termination of employment).

79.  For example, in *Hill v. Names & Addresses, Inc.*, the Illinois Appellate Court for the First District found that the defendant employee had breached her fiduciary duty to her employer when she solicited the clients of her former employer, prior to leaving, in order to

secure them for her new employer. 571 N.E.2d 1085, 1090, 1094 (Ill. App. Ct. 1991).

80. Given the evidence in this case, it is clear that Magner breached his fiduciary duty to VIM because he actively competed with VIM while still employed there. The only real issue before this Court is to pinpoint at what time Magner *began* breaching his duty. VIM argues that Magner began breaching his fiduciary duty on the date he formed Industrecycle. Magner argues that the breach occurred in late April, 2001 when Magner began diverting VIM's accounts. For simplicity, the Court discusses Magner's possible breach in the context of three time periods: 1) July, 1999 to April, 2000; 2) April 2000 through April 2001; and 3) May 2001 to August 15, 2001. During the first time period, from July, 1999 to April, 2000, Magner formed Industrecycle but did not begin doing any business with customers. During the second time period, from April 2000 though April 2001, Industrecycle serviced its first client, Dutch Maid. During the third period, from May 2001 until August 15, 2001, Magner diverted accounts from VIM.

### 1.    Period One: The Formation of Industrecycle

81. The first time period is from July 1999, when Magner and his brother formed Industrecycle, until April, 2000, when Industrecycle began operations ("Period 1"). During Period 1, Magner was named as Vice President of Industrecycle, he signed banking agreements on behalf of Industrecycle, and he deposited and received money into Industrecycle's bank account. However, during Period 1, Industrecycle did not conduct any business with customers.

82. Under Illinois law, Magner did not breach his fiduciary duty to VIM during Period 1 because he was merely involved in preliminary competitive activities. *E.J.*

*McKernan Co.*, 623 N.E.2d at 993. As stated above, an employee will not be considered to be in breach of his fiduciary duty by the mere formation of a rival concern. *Id.* Therefore, there was no breach by Magner for Period 1.

### 2. Period Two: Industrecycle Services Dutch Maid

83. The second time period is from April 2000, when Industrecycle acquired its first customer, Dutch Maid, until May, 2001, when Magner began diverting VIM's accounts ("Period 2"). During Period 2, Magner's brother, Tim Magner, acted as Industrecycle's President and principally serviced the Dutch Maid account. However, during that time, Magner served as Industrecycle's Vice President, was aware of his brother's dealings with Dutch Maid, and also knew that Industrecyle was a direct competitor of VIM's.

84. It was during Period 2 that Magner began breaching his fiduciary duty. While the Court acknowledges that Tim Magner principally serviced the Dutch Maid account, Luke Magner was made aware of the business and had some limited involvement in this account. Under Illinois law, Magner "commenced business as a rival concern" and this constitutes a breach. *McKernan Co.*, 623 N.E.2d at 993. At this point going forward until May, 2001, Magner was technically in breach of his fiduciary duty because he was not acting consistent with the best interests of his employer. *Id.*

### 3. Period Three: Magner Diverts Accounts to Industrecycle.

85. The third time period is from May, 2001, when Magner began diverting accounts from VIM to Industrecycle, until August 15, 2001, when Magner left VIM ("Period 3"). During Period 3, Magner actively solicited VIM customers Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps. Magner was able to convince these customers to do business

with Industrecycle instead of VIM; Magner himself began servicing these accounts for Industrecycle. Throughout Period 3, Magner represented to VIM that he was continuing to solicit business for VIM.

86. During Period 3, Magner was in serious breach of his fiduciary duty. As discussed in *Hill*, an employee may not solicit the customers of his employer while still working for that employer. 571 N.E.2d at 1090. In this case, not only did Magner solicit VIM customers while still employed there, he actually began to do rival business with them through Industrecycle. Magner's activities during Period 3 were clearly against the best interests of his employer and represent a serious breach of his fiduciary duty.

87. The Court concludes that Magner breached his fiduciary duty to VIM in Period 2, beginning in April 2000, when his rival company began conducting business in competition with VIM. However, the most serious breach of fiduciary duty occurred in Period 3, between May, 2001 and August, 2001, when Magner diverted VIM's accounts and took its business. The issue of damages will be discussed later.

## C. FRAUD

88. VIM next alleges a cause of action for fraud against Defendants Magner and Industrecycle. Under Illinois law, the elements of a claim for fraudulent misrepresentation are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co., Ltd*, 675 N.E.2d 584, 591 (Ill. 1996). "Fraud means anything calculated to deceive, including all acts, omissions and concealments

involving a breach of legal or equitable duty, trust or confidence resulting in damage to another." *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 392 N.E.2d 759, 762 (Ill. App. Ct. 1979). Fraud is never presumed; it must be proved by clear and convincing evidence. *Ray v. Winter*, 367 N.E.2d 678, 682 (Ill. 1977). There is no general rule for determining what facts will constitute fraud. Rather, its existence depends upon the particular facts of each case. *Id.*

89. In this case, this Court has found several instances in which Magner acted in an attempt to deceive VIM. First, at no time during Magner's employment with VIM did he disclose the existence of Industrecycle to the Plaintiff. Second, Magner deceived VIM regarding his trip to Sealed Air's eastern plants in April, 2001. While he told VIM that the purpose of the trip was to secure more accounts for VIM, he was instead securing those accounts for Industrecycle. As early as May 3, 2001, Industrecycle began pulling loads from the Sealed Air Holyoke, Massachusetts location. The cost of the trip was paid for by VIM. Third, on several occasions Magner misled VIM into believing that he was working on behalf of VIM when in fact he was not. Magner sent Jack McMahon a copy of a VIM proposal which he purportedly delivered to Dutch Maid Bakeries out east, in an effort to show VIM he was busy trying to secure accounts for VIM. However, Magner never sent the proposal to Dutch Maid since Industrecycle was already servicing the account. Indeed, Magner sent other fake proposals to prospective clients to McMahon in order to make VIM believe that he was attempting to solicit business on its behalf when in fact he knew these companies were not interested in doing business. Fourth, Magner misrepresented to Jack McMahon that the Olmarc, Sealed Air, and U.S. Gypsum accounts were lost to a competitor when the

accounts had actually been lost to Industrecycle.

90. These instances of deceit represent misrepresentations of material facts. Magner clearly knew these statements and actions were false. His intent was to make VIM believe that he was still working in the best interests of VIM in order to induce VIM to keep him employed while he stole its business. As VIM's salesperson, Magner served as the "point man" on each account. VIM relied on Magner to manage and keep these accounts. By fraudulently misrepresenting to Plaintiff what he was doing, Magner caused damage to VIM. Under these facts, this Court concludes that Magner acted fraudulently. *See Carey Electric, Inc.*, 392 N.E.2d at 763.

91. VIM has proven by clear and convincing evidence that Magner and Industrecycle committed fraud against VIM. The issue of damages will be discussed later.

## D.  TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

92. VIM last alleges that Magner and Industrecycle interfered with Plaintiff's prospective economic advantage by interfering with VIM's existing accounts and by wrongfully soliciting and securing various new recycling business opportunities away from his employer. Under Illinois law, the elements of tortious interference with prospective economic advantage are: (1) a reasonable expectation by the plaintiff of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate interest from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Felhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). "Purposeful

interference" means that the defendant has committed some impropriety in interfering with the expectancy. *Dowd and Dowd Ltd. v. Gleason*, 698 N.E.2d 358, 371 (Ill. 1998).

93.  As discussed previously, Magner diverted four VIM accounts to Industrecycle during his employment with VIM: Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps. These diversions amount to tortious interference on the part of Magner and Industrecycle. VIM had long-standing relationships with all four of these customers. VIM was the primary recycler for each of these customers for certain types of recyclables and thus had a substantially exclusive relationship with all four. These customers were generally happy with VIM's service and had no reason to switch but for Magner's and Industrecycle's interference. Thus, VIM had a reasonable expectation of a continuing relationship with Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps. Magner knew of this expectancy and yet purposefully interfered with these relationships, and his interference resulted in damages to VIM. *See Felhauer,* 568 N.E.2d at 878.

94. Magner also tortiously interfered with respect to possible future VIM customers. In the case of Sealed Air, as earlier noted, Magner (purportedly on behalf of Plaintiff), and James Kasprowicz, Sealed Air's representative, traveled to three other Sealed Air locations on the east coast in April or May, 2001. They went to these three locations, Holyoke, Massachusetts; Scotia, New York, and Saddle Brook, New Jersey, to discuss expanding VIM's recycling services to those locations. VIM was paying for the resulting travel expenses and costs. In or around May, 2001, Magner informed James Kasprowicz that he and his brother were going into their own recycling business, and offering to provide services to Sealed Air. At this time, VIM was still providing recycling services to the Hodgkins,

Illinois Sealed Air location. In April or May, 2001 Defendant Magner ultimately signed up the Holyoke location on behalf of Industrecycle. Magner began conducting business with the Saddle Brook, New Jersey Sealed Air location in July, 2002.

95. These actions represent a tortious interference with prospective business advantage. VIM had a reasonable expectation of entering into a business relationship with Sealed Air for the three Sealed Air locations not already being serviced by VIM. Defendant Magner, as the point man on this account for VIM, was aware of this expectancy. The actions by Magner clearly interfered with this prospective business relationship since he diverted the accounts to his own company. VIM relied on Magner's ability to enter into and maintain business relationships with their customers. Magner's interference on behalf of Industrecycle prevented VIM's legitimate business interests from ripening into a business relationship. This interference caused damage to VIM. *See Felhauer,* 568 N.E.2d at 878.

96. The Court concludes that VIM has proven that Magner and Industrecycle tortiously interfered with VIM's prospective business advantage by diverting existing and prospective accounts. These damages will be discussed later.

## E.    COUNTERCLAIM

97. As the Court earlier found, Magner was properly paid his commissions. Furthermore, VIM was not obligated to reimburse Magner for his moving expenses. This is because there was no employment agreement between VIM and Magner, and VIM properly paid him according to VIM's then existing commission structure. VIM sent Magner copies of his commission statements and he never objected prior to filing his counterclaim. Also, at no point did VIM promise to pay Magner for his moving expenses.

98. The Court concludes that Magner has not proven that he is entitled to recover damages under his counterclaim. There will be no damages awarded for this claim.

## F. COMPENSATORY DAMAGES

99. This Court has found that Magner breached his fiduciary duty to VIM; that Magner and Industrecycle were fraudulent; and that Magner and Industrecycle tortiously interfered with VIM's prospective business advantage. Plaintiff seeks damages in the form of lost profits, disgorgement of commissions earned, punitive damages, attorneys fees, and pre-judgment interest.

100. Where there has been a breach of fiduciary duty, a court can award lost profits, a forfeiture of wages, and punitive damages. *See Vendo v. Stoner*, 321 N.E.2d 1, 12-14 (Ill. 1974); *Hill*, 571 N.E.2d at 1099. Lost profits and punitive damages are also applicable where there has been tortious interference with prospective business advantage. *See Zdeb v. Baxter Intern., Inc*., 697 N.E.2d 425, 426 (Ill. App. Ct. 1998) (noting that a jury awarded several million dollars for a defendant's tortious interference). Where there has been fraud, a court can also award lost profits and punitive damages. *See Stojkovich v. Monadnock Bldg.*, 666 N.E.2d 704, 712 (Ill. App. Ct. 1996).

### 1. Lost Profits

101. This Court has concluded that Magner breached his fiduciary duty to VIM, that both Magner and Industrecycle tortiously interfered with VIM's prospective business advantages, and that Magner and Industrecycle acted fraudulently. Therefore, lost profits is an appropriate measure of damages. The first issue, therefore, concerns the appropriate measure of lost profit damages for Magner's breach of fiduciary duty and Magner's and

Industrecycle's tortious interference and fraud. Although the Court discusses the three theories for lost profit damages, the Plaintiff is only entitled to recover once and not aggregate the damages for each count.

102. Lost profit damages are calculated based upon "the difference between the profits which [the plaintiff] could reasonably be expected to make...and the profits which it did in fact earn." *Vendo*, 321 N.E.2d at 12-13. In *Vendo*, the Illinois Supreme Court affirmed a lower court's calculation of lost profits due to an employee's breach of his fiduciary duty to his employer. *Id.* at 15. The lower court calculated lost profits based upon the difference between the sales volume which the employer could have anticipated (had the breach not occurred) and the actual sales volume the employer experienced due to the breach. This profit ratio was then applied so as to arrive at the employer's lost profits. *Id.* at 13. Based upon this method, the court calculated damages over a seven year period.[2] *Id.*

103. Lost profits in a tort action are limited to those damages proximately caused by the defendant's wrongful conduct. *ABC*, 413 N.E.2d at 1312. The plaintiff must present competent proof of damages from which a reasonable basis of computation can be derived. *Id.* In *ABC*, the plaintiff proved his lost profits by presenting data and expert testimony which projected the profits ABC would have enjoyed over three years.

a. ***Magner's Breach of Fiduciary Duty***

---

[2] In *Vendo*, the court calculated that the plaintiff's market share prior to the period of breach was 31% and because of the actions of the defendants that market value fell to roughly 16%. *Vendo*, 321 N.E.2d at 13. The judgment represented the sum of the profits lost to plaintiff during the 7 year period of the defendant's breach, and the diminution in the value of the plaintiff's business as of the end of the period, attributable to defendant's activities. *Id.*

104. The first basis for an award of lost profits is Magner's breach of fiduciary duty. There is no doubt that Magner's breach of his fiduciary duty to his employer resulted in lost profits for VIM. Magner diverted four of VIM's long-standing customers while still an employee of VIM: Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps. Two of these clients testified at trial that they would not have followed Magner to Industrecycle had they known he was still an employee of VIM at the time. Therefore, VIM should receive the difference between the profits which it could reasonably have made from these four accounts and the profits which it did in fact earn. *Vendo*, 321 N.E.2d at 12-13. However, because there was no contractual relationship between VIM and its customers, there was no guarantee that VIM would continue to do business with these clients. Therefore, the court awards lost profits for Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps while Magner was employed at VIM through a period of two years after August 15, 2001, the date Magner left VIM. The Court accepts the 20.8% profit margin testified to by Joseph Dudley. The Court also accepts Dudley's computation of the damages as representing a reasonable computation.

### b. *Magner's and Industrecycle's Tortious Interference With Prospective Economic Advantage*

105. The second basis for lost profits damages is Magner's and Industrecycle's tortious interference with VIM's prospective business relationships. Magner and Industrecycle not only interfered with VIM's future profits from its long-standing customers (Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps), but they also interfered with VIM's prospective customers. Specifically, Magner and Industrecycle interfered with a prospective relationship between VIM and Sealed Air's Holyoke, Massachusetts and Saddle Brook, New

Jersey locations. Therefore, in addition to the damages above, VIM is also entitled to receive lost profits for these two Sealed Air locations during the time of Magner's employment with VIM and for a two year duration thereafter.

### c. Magner's and Industrecycle's Fraud

106. The third basis for an award of lost profits is Magner's and Industrecycle's fraudulent behavior. Magner acted fraudulently by, among other things, failing to disclose the existence of Industrecycle, by stealing VIM's customers and then lying to VIM about it, and by sending VIM false quotes that he purportedly sent to prospective customers on VIM's behalf. This Court's finding that Magner and Industrecycle were fraudulent is another basis for awarding lost profits. *See SK Hand Tool Corp. v. Dresser Indus., Inc.* 672 N.E.2d 341, (Ill. App. Ct. 1996) (discussing lost profit damages in connection with an allegation against a corporation for fraud). However, VIM is only entitled to collect actual lost profits once for the U.S. Gypsum, Olmarc, Harris Lamps, and the three Sealed Air accounts.

### 2. Forfeiture of Wages

107. In addition to lost profits, in cases of breach of fiduciary duty, Illinois law also permits a complete forfeiture of any salary paid by an employer to its employee during a time when the employee was breaching his fiduciary duty to the employer. *See Vendo,* 321 N.E.2d at 14-15. In *Vendo,* the court affirmed the lower court's judgment forfeiting all salary paid by the employer to the employee for three years and five months while he was usurping an opportunity that he never offered to the corporation. *Id.* at 14. In support of its decision to affirm an award of forfeiture in addition to lost profits, the court declared: "it borders upon the frivolous for the defendant to claim a right to retain compensation which the judgment

restored to the plaintiff." *Id.* In that case, the defendant did not have to forfeit his total compensation, just the compensation earned after he breached his fiduciary duty.

108. Although Magner technically began breaching his fiduciary duty in Period 2, when Industrecycle started doing business with Dutch Maid in competition with VIM, disgorgement is not warranted until the more serious breach in Period 3, which begins sometime in May, 2001. Unlike the employee in *Vendo*, Magner was a commissioned employee, which means that any money he earned during his employment at VIM was a result of his soliciting and retaining customers for VIM. Thus, throughout Period 2, although Magner was technically in breach of his fiduciary duty to VIM, Magner continued to work hard for VIM and continued to earn the company money. *See Monotronics Corp. v. Baylor* 436 N.E.2d 1062, 1066-67 (affirming the trial court's decision not to forfeit the breaching employee's compensation because the employer benefitted substantially from employee's performance of his duties during the period of his breach).

109. However, during Period 3, when Magner started diverting accounts and soliciting new customers for Industrecycle, Magner stopped "earning" his commissions. Indeed, Magner spent the greater part of May, June, and July in Massachusetts, not Chicago. It is clear that Magner did little work, if any, for VIM during that time; while Magner was in Massachusetts, Jack McMahon managed many of Magner's old accounts in Chicago. During Period 3, Magner was in total breach of his fiduciary duty to VIM and was not entitled to receive compensation from VIM in any form. Therefore, Magner must disgorge all of the commissions and other compensation he received for business generated from May 1, 2001 until the end of his employment with VIM. *See e.g.,* Ex. 241-46.

## G.     PUNITIVE DAMAGES

110.   Although states generally possess discretion over the imposition of punitive damages, the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.   *State Farm v. Campbell*, 538 U.S. 408, 416 (2003).   Courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.  *Id.* at 426.  The Supreme Court has instructed courts reviewing punitive damages to consider three guideposts: 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and 3) the differences between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  *Id.* at 418 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).  The most important indicator of the reasonableness of the punitive damages award is the degree of reprehensibility of the defendant's conduct.  *Id.* at 419 (citing *Gore*, 517 U.S. at 575).

111.   Courts have been instructed to determine the reprehensibility of a defendant's actions by considering whether: 1) the harm caused was physical as opposed to economic; 2) the tortious conduct displayed an indifference to or a reckless disregard for the health or safety of others; 3) the target of the conduct had financial vulnerability; 4) the conduct involved repeated actions or was an isolated incident; and 5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.  *Id.* at 419.  The existence of one of these factors may not be sufficient to sustain a punitive damage award and the absence of all of them renders any award suspect.  *Id.*  It should be presumed a plaintiff has been made

whole by compensatory damages, so punitive damages should only be awarded if the actions of the defendant are so reprehensible to warrant further sanctions to achieve punishment or deterrence. *Id.*

112. Under Illinois law, the initial determination of whether the facts and circumstances justify imposition of punitive damages is a question of law. *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1336 (Ill. App. Ct. 1995). Like the Supreme Court, Illinois courts have also recognized that the purpose of an award for punitive damages is to punish the individual responsible for the wrongful conduct, to teach the individual not to repeat the wrongful conduct, and to deter others from similar conduct. *Page v. City of Chi.*, 701 N.E.2d 218, 227 (Ill. App. Ct. 1998). It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others. *Stojkovich v. Monadnock Bldg.*, 666 N.E.2d 704, 712 (Ill. App. Ct. 1996). Punitive damages may also be allowed "where the wrong involves some violation of duty springing from a relation of trust or confidence." *Home Sav. & Loan Ass'n of Joliet v. Schneider*, 483 N.E.2d 1225, 1228 (Ill. 1985) (finding that punitive damages were proper when the defendant employee had knowingly and intentionally interfered with his employer's clients and employees).

113. In this case, Magner acted fraudulently and "breached the trust" of his employer; thus his actions clearly warrant the imposition of punitive damages. Although Magner technically breached his fiduciary duty during Period 2, his actions rose to a level necessitating punitive damages in Period 3 when he began diverting his employer's accounts,

lying to his employer, and stealing possible customers from his employer while still employed there. Magner's actions were intentional and fraudulent, and in deliberate disregard of the fiduciary duty he owed to VIM. Moreover, these actions caused serious economic harm to VIM. An award of punitive damages therefore meets the standard set forth by the Supreme Court in *State Farm*. 528 U.S. at 419. Therefore, this Court awards punitive damages to VIM against Magner and Industrecycle jointly for Magner's actions during Period 3 in the amount of $75,000.

## H.  PREJUDGMENT INTEREST

114.  Prejudgment interest may be recovered from a fiduciary where he is found to have breached his fiduciary duty. *NC Illinois Trust Co. v. First Illini Bancorp, Inc.*, 752 N.E.2d 1167, 1180 (Ill. App. Ct. 2001); *see also Jefferson Nat'l Bank of Miami Beach v. Cent. Nat'l Bank in Chicago*, 700 F.2d 1143 (7th Cir. 1983) (finding that a jury's award calculated on the basis of the prime rate properly compensates the plaintiff for lost income caused by a breach of fiduciary duty). 815 ILCS 205/1 sets the statutory prejudgment interest rate at five percent. In the present case an award of prejudgment interest at the statutory rate is fair and within the power of the court. Therefore, VIM is awarded pre-judgment interest for all damages related to lost profits and forfeiture of wages.

## I.  COURT COSTS

115.  VIM is the prevailing party and is thus entitled to receive court costs pursuant to Fed. R. Civ. P. 54(d)(1).

## III.  CONCLUSION

When he first started out of college, Luke Magner was a young, hard-working

salesperson for VIM. VIM trained him, gave him several accounts, employed him for over six years, and trusted him as the "point man" for as many as 100 VIM customers. Unfortunately, when this young salesperson determined to start his own competitive business, he decided to go about it in a fraudulent, deceptive manner which seriously breached the trust of his employer. While the Court acknowledges the Defendant was a young man who, in his own mind, was trying to protect his financial security, as well as the financial security of his family, there is a right way to do things, and a wrong way. The defendant chose the wrong way, and he must suffer the consequences.

For the foregoing reasons, under the Second Amended Complaint, Defendant Luke Magner is liable for breach of fiduciary duty, fraud, and tortious interference with prospective business advantage. Defendant Industrecycle is liable for fraud and tortious interference with prospective business advantage. Plaintiff VIM is entitled to lost profits during Magner's employment at VIM and for two years thereafter relating to the diverted Sealed Air, U.S. Gypsum, Olmarc, and Harris Lamps accounts, the Sealed Air's Holyoke,

Massachusetts and Saddle Brook, New Jersey locations and repayment of commissions and compensation earned by Magner beginning May 1, 2001 until his employment ended. Prejudgment interest shall apply to damages related to lost profits and forfeiture of wages. Due to the nature of Magner's actions, VIM is also entitled to punitive damages from Magner and Industrecycle in the amount of $75,000. In addition, judgment will be entered in favor of VIM on Magner's counterclaim. The parties are directed to jointly prepare a final judgment in this case inserting the actual amounts of damages and making the interest computations and deliver the proposed form of final judgment order to the Court on or by August 12, 2005. A status will be held on August 16, 2005 at 10:00 a.m. in the event the parties cannot agree as to the form of the judgment. In addition, VIM shall file its bill of costs on or by August 3, 2005. Objections if any, are to be filed by August 10, 2005.

**SO ORDERED THIS 21st DAY OF JULY, 2004.**

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**


**Copies mailed to:**

Aldo E. Botti
Peter M. DeLongis
BOTTI, MARINACCIO & DELONGIS, LTD.
720 Enterprise Drive
Oak Brook, IL 60523

Counsel for Plaintiff

L. Andrew Brehm
Michael T. Roche
SCHUYLER, ROCHE & ZWIRNER, P.C.
One Prudential Plaza
130 East Randolph Street
Suite 3800
Chicago, IL 60601

Counsel for Defendants